Good morning, Your Honor. Marco Jimenez for the petitioner in this matter. May it please the court? Go ahead, Mr. Cristobal. Your Honor, I would like to reserve three minutes for rebuttal. How many minutes? Three minutes. Three minutes. You may. The petitioner in this case, Your Honor, is from Guatemala. She's a female. She came to the United States back in 2014 seeking asylum. Her application for asylum was based on the fact that she was labeled a lesbian in her community because she had to wear pants, or she chose to wear pants, in order to do her job. Her limited education limited her to the opportunities she had, and she chose to gather logs and grass to sell at the market. She found that wearing pants would be more preferable for it, and she also liked it. Because of that style dress of her choosing, the community labeled her a lesbian and began to have issues with her, harassing her and threatening her, telling her she had to conform. Eventually, it got to the point that she got death threats. Despite this, the petitioner continued to dress the same way and continued working her job, and eventually she got married to a man. Because of all the gossip and harassment and death threats, her marriage ended because of it. This created a very toxic atmosphere for her, and she decided to leave the country to the United States. The government issued an NTA against her, and she filed her asylum petition. In 2019, the immigration judge ruled and denied her petition for asylum. Before she left the country, she filed a complaint with the Justice of the Peace Court, correct? That is correct. She did file a complaint. And the court issued a ruling in her favor, correct? That is correct, Your Honor. But she left the country before anything could happen with regard to what the court did. She left within a couple of months, right? That's correct, Your Honor, but in her declaration, she does indicate that the harassment continued regardless of that judgment. So, did you argue to the BIA that the harassment was with the acquiescence of the Guatemalan government? Is that anywhere in your brief to the BIA? I don't believe it was, Your Honor. So, counsel, let's assume hypothetically we were to agree with you on the social group, and were to agree with you, for example, that death threats can constitute past persecution. What do we do with the fact that you never argued to the BIA that this was via with the acquiescence of the government? Your Honor, because of the fact that the harassment never ended. My client petitioner did go to the government and sought aid, but as reported on the Human Rights Report, the government does not help people who are to be believed in the LGBTI plus community. But even if that's true, isn't part of your claim have to be that the harassment is by or with the acquiescence of the government, and aren't you required to raise that to the BIA in your appeal? It was, Your Honor, because she did go to the government, and the government refused her. Actually, while they issued the judgment, they did nothing besides that action. The actual harassment continued. Well, in making the arguments to the BIA about the social group and submitting the country report, were you not also arguing that the government was not acting with respect to actions taken against the LGBT community? That is correct, Your Honor. And while my client, the petitioner in this case, is not part of the LGBTI community, she was labeled as a part of that group, and because of that, she had to fall into that group. The whole community believed her to be a lesbian, and all the protections that people who are in that group lacked because of the government in Guatemala. Mr. Jiménez, as far as I – from reading the record, my understanding is she was found to be credible at all stages of this process. The asylum officer found her credible. The IEJ found her credible. There was not a question of – as to her credibility, was there? That is correct. The judge found her testimony credible, Your Honor. And part of her record was that even after the justice of the peace referral, she still continued to be harassed, and she felt that she had to leave a few months later. I think it was her grandfather was crying that she might die. No one ever considered that to be an incredible statement, was there? No. There was no – nobody raised that issue, and the judge found her credible. As to her testimony, that's correct. Now, do we know if there were ever any arrests, prosecutions, or anything that resulted from this criminal referral or this action taken by the justice of the peace? As far as the petitioner is concerned, she has no information on that. Okay. Counsel, your client also, in her complaint to the justice of the peace, said that as part of the threats to her, the authorities were called. It was for that reason that they came to rescue me. If not to the present date, I would be in the hospital or dead. That's what she had said, right? Yes, she did, Your Honor. And the authorities she's referring to there were the police? That is correct, Your Honor. However, besides that rescue that one time, they did nothing to stop the harassment. What could they have done to stop the harassment, arrested the people? They could have made a declaration to the community. This is very small, neat communities in Guatemala. What could they have declared to the community? One, that she wasn't a lesbian. Two, that they would be arrested if they continued the harassment of her. Now, there was something in the record about the mayor of her town that may have been, I guess, accepting of this behavior by the community. Is that your understanding of this, that the mayor himself or herself might have also acquiesced? I don't want to put words in your mouth, but what was the mayor's role in this? My client sought aid from various people in the community, including the mayor. In her declaration, she says that they did nothing. She refused, always saying that she was not part of the LGBT community, she was not a lesbian. But because of just the fact that she was raising this man, that stigma, obviously, we don't believe that it's a stigma in the U.S., but in Guatemala, that's a very big deal. The judge also found that the group, the particular social group, would not be recognizable because the style of dress was not a protected ground. This court already found, in one instance, that style of dress could be protected. While that case was in regards to someone who's actually in the LGBTI community, in my client, it's not. I could say that also the court says that it could be voluntary association, besides an immutable characteristic. In her case, she voluntarily joined a group of people who collect logs and grass, basically hard labor, and she chose to wear pants. You have about a minute left for your rebuttal, a little more than a minute. Would you like to reserve the rest of your time? Yes, Your Honor. Okay. Counsel, yes, please. May I please the court? John Stanton for the respondent. A little over 30 years ago, this court issued an opinion involving another Guatemalan seeking asylum. For reasons that are not pertinent here, the court denied the petition and published opinion. In the conclusion of the opinion, the court expressed great sympathy for the petitioner and recognized there are many valid good reasons why someone in Guatemala would want to come to the United States, including, among other things, safety reasons. The court also recognized, for better or for worse, Congress has not opened up all of its borders, opened up our borders to allow anyone who wishes the benefits of the United States to enter and remain in our country. Rather, certain standards need to be met. The case is, it's not cited in our brief, but it's Arriaga-Orientos v. INS, 937. Counsel, if the petitioner had stated in her credible fear interview or to the IJ everything about the harassment that she stated and also stated, and I am a lesbian, would that group be cognizable? Proceed to be a lesbian, this court has not held so in a published opinion. Well, what's the government's position? Is the government's position that someone who is persecuted because they're a lesbian, is that a cognizable social group? If they are LGBT, absolutely, yes, your honor. So is it the government's position that even though the petitioner suffered this kind of harassment, that it's not a cognizable group because she didn't aver that she actually was part of the group that she was perceived as being? I don't really, I don't really understand how that could work. Well, it's not cited in our brief, but the Eighth Circuit ruled that perceived to be gay when you're not, it's not a cognizable social group. It's not cited in our brief, but again, that's not the case here. That wasn't a proposed particular social group. So it was, I mean, women in Guatemala who are perceived to have male tendencies and are seen as dangerous to the community. That's not quite what your honor is asking. I'm happy to engage. How about if we changed it a little? How about also dealing with Central America? What if someone was perceived to be indigenous and was persecuted for that reason, but wasn't actually indigenous? Would that work? Indigenous, I mean, I would like to think that indigenous is something that is central to your being. I would like to think that perceived to be indigenous, it's a complicated issue, your honor. So, I mean, I submit that. There have been cases from this court perceived to be wealthy, perceived to be Americanized. Mr. Stanton, but to follow up on my colleague's question, isn't one's sexual orientation a pretty central feature as well? And so if you're perceived to be a certain sexual orientation, why wouldn't that be a protected category? If she were actually a lesbian, I mean, I don't want to, I guess I have to buy the government. I would submit yes, yes. Again, fully emphasizing that is not the case here. I would say yes, but I would recommend the court not actually address that issue until it actually has a case where someone is perceived to actually be LGBT or. But getting past a minute, perhaps exactly what she was proposing, the thrust of her argument was clear that she suffered the harassment she did because the entire community perceived her as being a lesbian. I mean, that is the entirety of her allegations in this regard. And that's that's why she was harassed. And she said that's why one of the reasons she wanted to get married to try to defeat that exact perception. You would think it would be easy for someone to dispel the perception that they're gay. I don't know if your honor is a baseball fan. There was a good catcher named Mike Piazza. There were rumors going around. He was gay and he called a press conference. Everyone, I'm not gay. And that that that seemed to solve the problem. But at a minimum, your honor, and a minimum that does not appear the police, the prosecutors here perceived her to be to be a lesbian. I mean, she told him that that appeared in her complaint, which I would like to address some of the issues. Well, I want to I want to ask a different question. Let's let's assume for the moment that we didn't agree with the government on past persecution and we didn't agree on the social group. This is an unusual type situation where the BIA issued a streamlined deferments. So we have no idea whether the BIA agreed with the IJ on government acquiescence or did not. Correct. We have no idea what the members decision was based on. Right. Well, I mean, the whole point is Jim lined up for that. They agree with what the IJ said. It's almost like. But we don't know what they agreed with. They could have agreed on the social group. They could have agreed on the persecution. They could have agreed on the acquiescence or they could have decided, for example, we don't agree on the acquiescence, but we agree on the social group. And that's enough. Right. This is not a bravado affirmance. Right. It's not a bravado, but I think it's the equivalent of bravado. So, I mean, I mean, I would I would submit that in this case, when the board does what the summary affirmance, it's essentially agreeing with everything. It's essentially bravado. So with respect, counsel, our court has disagreed with you on that with regard to with regard to the with regard to the the streamline affirmance. So is it the government's position that we shouldn't we if we just if we disagree with you on social group and persecution? Shouldn't we remand the case to the BIA to reconsider the case in light of our rejection of those two grants? Since we have no idea what the basis was for the BIA's affirmance? Well, there's still acquiescence unwilling, unable. So that will be I understand you're probably going to say that, like, well, we don't know if they agreed on that. But, I mean, there are some things in the record I would like to correct that may inform the court on the if anything, it may be futile to remand on unwilling or unable. I mean, like this is what from the record we know based on a police statement, the incident where she was, I mean, she was told to take off her clothes or else they will burn her. The half on December 20th, 2013. That's on the page 155 of the administrative record. And we don't know what happened the next two weeks. I'm sorry, next week. But she obviously talked to a prosecutor, some with legal training. She submitted her complaint to the Justice of the Peace on December 28th, 2013. That's on page 156. And the same day, the Justice of the Peace granted the petition and issued what is the equivalent of. I'm not familiar with the Guatemalan justice system, but it looks like it's the equivalent of an arrest warrant. And your honor, she did not leave Guatemala a few months later. She left two days later. Is that is that in there? Is that in the record? Counsel on page 207 of the administrative record, her asylum application. She says she left Guatemala on January 2nd, 2014. That's leaving Guatemala. That's not leaving her hometown of Guatemala. Yeah, I had missed that council. I saw that she arrived in the country in March, but I didn't see in the record the date that she left. But I'll go look at a R207. Yes. Inherent in the unwilling, unable. I mean, I'm not sure this court has ever said that. But inherent in the unwilling, unable standard is that you've got to give your government some time to, I mean, do something. You can't just file a complaint and leave the next day. Although although well before the complaint was filed, the villagers took her to the police. And basically, as I understand the record, what the police told her was, well, stop dressing like a man. And that's not the way I remember the record, your honor. I don't think they went to the police until the December 20th incident. That was. And as far as the record is concerned, the way I remember the record, the December 20th incident would go at times she actually received threats. She received harassment. Mr. Stanton, wasn't there an instance where there was a crowd of people waiting at her workplace and she described it as that they were ready to burn her or lynch her or kill her? And that was when the police intervened. Right. That was December 20th, your honor. So when. But but before that, before that, I recall something where the villagers had taken her to the police or and nothing came of it. As far as I know, there there haven't been there were never any arrests made. As far as we know in the record related to this sort of harassment that she that she was experiencing. Was there no arrest? Probably because the police didn't have a complaining witness anymore. She took off like two days after the judge petitioned arrest. What same thing happens here? If they don't have a complaining witness, it's very hard to prosecute someone. I guess they could have arrested someone. Maybe they did. We don't know. We don't know. I'm almost out of time. But the one is that you may be remembering a crowd gathered to make it impossible for her to remain in the town. But what she doesn't say is or else what? I mean, there were insults. There was I mean, there was harassment. No question. But harassment is not prosecute. Although although counsel, the record is clear that in various places she said that she was told by people they would kill her. But not the way I remember the record. I mean, I mean, the only death that she got was December, December 20th. Like I was in a police statement. So, I mean, I mean, I apologize if I'm not correct. I didn't write the brief, but I read the record last week. And so, yes. Well, we'll look we'll look at it again, counsel. All right. If I'm wrong, I very much apologize. That's the way I remember the record. And so anyway, but I mean, so Mr. Jim says, like the death threats cost your marriage to suffer. My recollection of the record, the death threats didn't occur until after she'd already separated from her husband. She got married in May 2013. They separated a couple months later because of the gossip and all that. The death threats did not occur until until December, until after she separated from her husband. So and if I'm wrong, I beg the court's pardon. But that's generally the way I remember the record. OK. Thank you, Mr. Tim. Mr. Jimenez, you have the last word. Yes, your honor. I believe the record and my petitioning her declaration does state earlier that she'd received death threats. And she was taken with the community as a whole when she refused to stop wearing pants. Those actions were in itself violent. Can I ask you to can I ask you to clarify the earlier point about when she left the country and in relation to the justice of the peace and his or her actions? Yes, your honor. She left right after soon after her her complaint. But you have to understand at that point she had been suffering harassment from that community for years. And she also suffered the destruction of her marriage. There was no hope for her at that point of receiving any kind of help. She had gone to the authorities before they they knew about her plight. There was no arrests as far as she knows. And we know. So her action of leaving right away, I don't believe is unjustified. Okay. Thank you. Thank you. The matter will stand submitted and we'll move on to the next case. Thank you both for your arguments. Thank you.
judges: BENNETT, SANCHEZ, Foote